IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Jeffrey W. Scullin, Jr., | CASE NO. 1:21-cv-485 |
| Petitioner, | DISTRICT JUDGE
Dan Aaron Polster |
| vs. | MAGISTRATE JUDGE
James E. Grimes Jr. |
| Warden Tom Schweitzer, | |
| Respondent. | **REPORT &
RECOMMENDATION** |

Jeffrey W. Scullin, Jr. filed a Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus. Doc. 1. Scullin is currently in custody at the North Central Correctional Complex serving an aggregate life-plus-three-year sentence imposed by the Cuyahoga County Court of Common Pleas in State v. Scullin, Case No. CR-17-622929-A. The Court referred this matter to a Magistrate Judge under Local Rule 72.2 for the preparation of a Report and Recommendation. For the following reasons, I recommend that the Court dismiss Scullin's petition.

### Summary of underlying facts

In habeas corpus proceedings brought under 28 U.S.C. § 2254, factual determinations made by state courts are presumed correct. 28 U.S.C. § 2254(e)(1). "This presumption also applies to the factual findings that [a] state appellate court makes on its review of the state trial record." *Johnson v. Bell*,

525 F.3d 466, 474 (6th Cir. 2008). The petitioner has the burden of rebutting

that presumption by clear and convincing evidence. *Id*.

    The Ohio Court of Appeals for the Eighth Appellate District summarized

the facts underlying Scullin's conviction as follows:

> {¶2} The instant matter arose from the murder of
> Melinda Pleskovic (hereinafter "victim") on October
> 23, 2017, at her residence in Strongsville, Ohio. The
> victim was a 49-year-old school teacher.
>
> {¶3} On October 23, 2017, police were dispatched to
> the victim's residence regarding a possible stabbing.
> Upon arriving at the home, officers found the victim
> laying on the kitchen floor. The victim was
> unresponsive and bleeding profusely. She had
> sustained approximately 35 stab wounds and two
> gunshot wounds. The victim was transported to
> Southwest General Hospital where she was
> pronounced dead at approximately 9:00 p.m. (Tr.
> 156.)
>
> {¶4} The responding officers also encountered the
> victim's husband Bruce Pleskovic, the victim's son,
> and appellant at the residence. Appellant was
> engaged to the victim's daughter, and he was living
> in the basement of the victim's home at the time of
> the murder. Officers spoke with the victim's
> husband and appellant at the scene. Furthermore,
> officers obtained and executed search warrants for
> the residence, three vehicles that were parked in the
> driveway when officers arrived on scene, and cell
> phones belonging to the victim, her husband, and
> appellant.
>
> {¶5} The following day, officers searched one of the
> vehicles that was parked in the driveway, a
> Chevrolet Silverado truck, that appellant had been
> driving at the time of the incident. Officers
> discovered a knife inside the truck that had "some
> red staining" on the blade. (Tr. 101.) Preliminary

testing of the red substance confirmed that it was human blood.

{¶6} The knife was submitted to the medical examiner's office for DNA analysis. DNA testing revealed that the victim's DNA was present on the knife's blade and handle, and appellant's DNA was present on the knife's handle. After receiving the results of the DNA testing, officers obtained a warrant for appellant's arrest.

{¶7} On October 31, 2017, after obtaining the DNA testing results and a warrant for appellant's arrest, officers asked appellant to come to the Strongsville Police Department. Appellant was initially interviewed by Strongsville Police Detective Ron Stolz. During this interview, appellant was placed under arrest.

{¶8} Subsequently, Lance Fragomeli, an FBI special agent and polygraph examiner, interviewed appellant and also administered a polygraph examination. After taking the polygraph examination, appellant ultimately confessed to stabbing and shooting the victim. Appellant informed the police that he put the gun with which he shot the victim in a Buick LeSabre, and that the vehicle was parked in the driveway of his parents' house. Appellant provided officers with consent to search the LeSabre.

{¶9} Officers searched the LeSabre and recovered a .357 revolver and a pair of sweatpants containing blood stains inside. Ballistic testing confirmed that the victim had been shot by the .357 revolver that was recovered from the LeSabre. DNA testing of the revolver indicated that appellant's DNA was on the handle, barrel, and trigger of the gun. Furthermore, DNA testing of the sweatpants recovered from the LeSabre indicated that appellant's DNA was present on the waistband and the blood stains on the pants were the victim's blood. (Tr. 232.)

*State v. Scullin*, 2019-Ohio-3186, 2019 WL 3764587, at *1–2 (Ohio Ct. App. 2019) (footnote omitted).

## Procedural background

*Trial court proceedings*

In November 2017, a Cuyahoga County grand jury issued a seven-count indictment charging Scullin with: aggravated murder, in violation of Ohio Revised Code § 2903.01(A); murder, in violation of Ohio Revised Code 2903.02(B); felonious assault, in violation of Ohio Revised Code 2903.11(A)(1); felonious assault, in violation of Ohio Revised Code 2903.11(A)(2); tampering with evidence, in violation of Ohio Revised Code 2921.12(A)(1); making false alarms, in violation of Ohio Revised Code 2917.32(A)(3); and endangering children, in violation of Ohio Revised Code 2919.22(A). The first four counts contained firearm specifications. Doc. 6-1, at 4–7. Later in November, Scullin entered not guilty pleas. Doc. 6-1, at 12.

The Ohio court of appeals summarized the procedural history following Scullin's arraignment:

> {¶11} On December 19, 2017, appellant filed a motion for leave to file a suppression motion after the exchange of discovery. The trial court granted the motion on December 20, 2017, ordering defense counsel to file a motion to suppress within 30 days of the exchange of discovery.
>
> {¶12} On August 16, 2018, appellant filed a motion to compel discovery. Therein, appellant sought an order compelling the state to turn over any and all evidence related to the polygraph examination that was administered to appellant on October 31, 2017.

{¶13} The state filed a brief in opposition to appellant's motion to compel on August 27, 2018. Therein, the state argued that the results of the polygraph examination were not subject to discovery under Crim.R. 16. The trial court denied appellant's motion to compel on August 28, 2018.

{¶14} In addition to the motion to compel, appellant filed a motion to suppress on August 16, 2018. Appellant filed a supplemental motion to suppress on August 22, 2018.

{¶15} In his motions to suppress, appellant requested an order suppressing the following evidence: (1) the evidence obtained from the search of appellant's Chevrolet Silverado truck, which was parked in the driveway of the victim's residence on the night of the murder (knife), (2) the evidence obtained from the search of appellant's cell phone and phone records, (3) the statements appellant made to police, and (4) the evidence obtained from the search of the Buick LeSabre, which was parked in the driveway of appellant's parents' house (.357 revolver and sweatpants containing blood stains). With the exception of the LeSabre, all of these searches were conducted pursuant to a search warrant. After appellant admitted to stabbing and shooting the victim during Special Agent Fragomeli's October 31, 2017 interview, appellant provided officers with consent to search the LeSabre. (Tr. 203.)

{¶16} On August 27, 2018, the state filed a motion for an extension of time to respond to appellant's suppression motion. The trial court granted the motion for an extension of time. The state filed its brief in opposition to appellant's motion to suppress on September 18, 2018.

{¶17} The trial court held a hearing on October 12, 2018. The state placed the terms of a plea agreement on the record that had been offered to appellant. Defense counsel indicated that appellant rejected

the plea offer. The trial court proceeded to hold a hearing on appellant's motion to suppress.

{¶18} The following six witnesses testified during the suppression hearing: (1) Dr. Nasir Butt, DNA technical manager and supervisor with the Cuyahoga County Regional Forensic Science Laboratories; (2) Strongsville Police Officer Patrick O'Sullivan; (3) Strongsville Police Sergeant Steven Piorkowski; (4) Strongsville Police Detective Steve Borowske; (5) Detective Stolz; and (6) Special Agent Fragomeli.

{¶19} The suppression hearing concluded on October 16, 2018. After considering the parties' arguments and the testimony adduced during the hearing, the trial court denied appellant's motion to suppress.

{¶20} On October 17, 2018, appellant withdrew his not guilty plea and entered a plea of no contest to the seven offenses charged in the indictment.[1] Based on the evidence proffered, the trial court found appellant guilty on all seven counts and the underlying specifications. The trial court ordered a presentence investigation report and set the matter for sentencing.

*Scullin*, 2019 WL 3764587, at *2–3.

On October 29, 2018, Judge Pamela A. Barker sentenced Scullin on count one to life in prison with a three-year firearm specification "to run prior to and consecutive to" count one. Doc. 6-1, at 142. The trial court imposed sentences on the remaining counts, which it ordered to run concurrent to the sentence on count one. *Id*.

---

[1]     During his plea hearing, Scullin's counsel stated that he was "maintaining his appellate rights." Doc. 6-3, at 134. The trial court then confirmed that Scullin understood that he would "have appellate rights associated with the decision on the motion to suppress." *Id*.

*Direct appeal*

Scullin's counsel filed timely a notice of appeal with Ohio's Eighth District Court of Appeals. Doc. 6-1, at 144–45. In his supporting brief, he raised four assignments of error:

> I. The trial court erred in improperly shifting the burden from the state to the defense in ruling that the defense did not prove misconduct.
>
> II. The trial court erred in denying Appellant's motion to compel because the evidence sought was material to the defense and relied upon by the State of Ohio.[2]
>
> III. The trial court erred in denying Appellant's motion to suppress because no reasonable person would have believed that the consent to search exceeded beyond the brief period necessary to remove a diaper bag.
>
> IV. The trial court erred in finding the search warrants for appellant's cell phone and cellular data were supported by probable cause and included particularized descriptions.

*Id.* at 162. The court of appeals affirmed on August 8, 2019. *Scullin*, 2019 WL 3764587.

---

[2] The Ohio Court of Appeals explained that:

During oral arguments, [Scullin's] counsel explained that he did not want the state to turn over a video recording of the polygraph examination to use at trial; rather, he wanted the state to turn over charts and/or graphs from the polygraph examination that Special Agent Fragomeli used during the post-polygraph interview.

*Scullin*, 2019 WL 3764587, at *18 n.4.

Eight days later, Scullin filed an application for en banc reconsideration.

Doc. 6-1, at 306–14. In his application, Scullin argued:

1. Panel decision failed to consider the interrogation on October 31, 2018 as a whole, which creates a conflict with long-standing precedent.

2. Panel decision to consider probable cause due to mere proximity to a criminal act conflicts with long-established precedent within the Eighth District.

3. The Panel's decision fails to account for prevailing law as to the constitutionally of search warrants seeking cell-site location information.

*Id*. at 307–14. The court of appeals denied Scullin's application on November

22, 2019. *Id.* at 325–26.

Acting through counsel, Scullin filed a notice of appeal with the Ohio

Supreme Court on January 3, 2020. Doc. 6-1, at 327–28. In his memorandum

in support of jurisdiction, Scullin raised four propositions of law:

I. A defendant in a criminal case is deprived of his constitutional rights where the trial court shifts the State's burden to the defense thereby permitting law enforcement to engage in coercive interrogation tactics involving threats of death.

II. A defendant in a criminal case is deprived of his constitutional protections where law enforcement concedes that a non-consensual search was conducted without probable cause.

III. A defendant is deprived of his state and federal constitutional protections where law

enforcements seizes cell-site information without probable cause.

IV.    A defendant is denied due process where the State withholds evidence from an off-camera polygraph examination conducted by the State on the defendant despite having used that evidence to continue interrogation techniques.

Doc. 6–1, at 331. On March 3, 2020, the Ohio Supreme Court declined under rule 7.08(B)(4) of its rules of practice to accept jurisdiction. *Id*. at 411. Two days later, Scullin moved the Ohio Supreme Court to reconsider. *Id*. at 412–16. The Ohio Supreme Court denied Scullin's motion on April 28, 2020. *Id*. at 418.

*Federal habeas proceedings*

Acting through counsel, Scullin filed his petition for writ of habeas corpus on March 2, 2021, less than one year after the Ohio Supreme Court's March 3, 2020 decision. *See* Doc. 1. He raises the following grounds for relief:

GROUND ONE: Unreasonable governmental search and seizure of Petitioner's vehicle.

GROUND TWO: Unreasonable governmental search and seizure of Petitioner's cell phone and cellular data.

GROUND THREE: Due process deprivation resulted from the government's refusal to produce material evidence related to an unrecorded, coercive interrogation.

GROUND FOUR: Unduly coercive interrogation techniques resulted in the violation of constitutional rights guaranteed by the Fifth and Fourteenth Amendments.

9

Doc. 1, at 6–11. He provides supporting facts in an attached document. *See* Doc.

1-2. Respondent Warden Tom Schweitzer filed a return of writ in response.

Doc. 6. Scullin filed a traverse. Doc. 9.

## Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub.

L. 104-132, § 104, 110 Stat. 1214 (AEDPA or the 1996 Act), habeas petitioners

must meet certain procedural requirements to have their claims reviewed in

federal court. *Smith v. Ohio Dep't of Rehab. & Corr*., 463 F.3d 426, 430 (6th

Cir. 2006). "Procedural barriers, such as statutes of limitations and rules

concerning procedural default and exhaustion of remedies, operate to limit

access to review on the merits of a constitutional claim." *Daniels v. United

States*, 532 U.S. 374, 381 (2001). Although procedural default is sometimes

confused with exhaustion, exhaustion and procedural default are distinct

concepts. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Failure to

exhaust applies when state remedies are "still available at the time of the

federal petition." *Id*. (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)).

But when "state court remedies are no longer available to a petitioner because

he or she failed to use them within the required time period, procedural default

and not exhaustion bars federal court review." *Id*.

*Exhaustion*

A federal court may not grant a writ of habeas corpus unless the

petitioner has exhausted all available remedies in state court. 28 U.S.C. §

2254(b)(1)(A); *Robinson v. Horton*, 950 F.3d 337, 343 (6th Cir. 2020). A state defendant with federal constitutional claims must "fairly presen[t]" those claims to the state courts before raising them in a federal habeas corpus action. *Robinson*, 950 F.3d at 343 (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006). A constitutional claim for relief must be presented to the state's highest court to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845–48 (1999); *Caver v. Straub*, 349 F.3d 340, 345 (6th Cir. 2003). And a habeas petitioner must "present[] both the factual and legal basis for [the] claims to the state courts." *Hanna v. Ishee*, 694 F.3d 596, 606 (6th Cir. 2012). This means that the "petitioner must present his claim to the state courts as a federal constitutional issue—not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984). "'[G]eneral allegations of the denial of rights to a "fair trial" and "due process" do not "fairly present claims" that specific constitutional rights were violated.'" *Hand v. Houk*, 871 F.3d 390, 418 (6th Cir. 2017) (quoting *Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006)).

*Procedural default*

Procedural default may occur in two ways. *Williams*, 460 F.3d at 806. First, a petitioner procedurally defaults a claim by failing "to comply with state procedural rules in presenting [the] claim to the appropriate state court." *Id*. In *Maupin v. Smith*, the Sixth Circuit directed courts to consider four factors when determining whether a claim is barred on habeas corpus review due to a

petitioner's failure to comply with a state procedural rule: (1) whether there is a state procedural rule applicable to the petitioner's claim and whether the petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) whether the petitioner can demonstrate cause for failing to follow the rule and actual prejudice by the alleged constitutional error. 785 F.2d 135, 138 (6th Cir. 1986); *see also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see Woolbright v. Crews*, 791 F.3d 628, 631 (6th Cir. 2015) ("When a petitioner has failed to fairly present … claims to the state courts and no state remedy remains, [the] claims are considered to be procedurally defaulted."). While the exhaustion requirement is technically satisfied because there are no longer any state remedies available to the petitioner, *see Coleman v. Thompson*, 501 U.S. 722, 732 (1991), a petitioner's failure to have the federal

12

claims considered in the state courts constitutes a procedural default of those claims that bars federal court review. *Williams*, 460 F.3d at 806.

To overcome a procedural bar, a petitioner must show cause for the default and establish that actual prejudice resulted from the alleged violation of federal law, or show that a fundamental miscarriage of justice will result if the petitioner's claims are not considered. *Coleman*, 501 U.S. at 750.

*Merits review*

To obtain habeas relief under 28 U.S.C. § 2254, a petitioner must show either that the state court decision (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the" United States Supreme Court ("contrary to" clause); or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" ("unreasonable application" clause). 28 U.S.C. § 2254(d).

Under the *contrary to* clause, a federal habeas court may grant a writ if the state court "arrives at a conclusion opposite to that reached by the [United States Supreme] Court on a question of law or [based on] a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Under the *unreasonable application* clause, a federal habeas court may grant the writ "if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "Clearly established federal law" refers to the

13

holdings, not dicta, of the Supreme Court's decisions as of the time of the relevant state court decision, and legal principles and standards flowing from Supreme Court precedent. *Id.* at 412; *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005). A state court is not required to cite Supreme Court precedent or reflect an awareness of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts" such precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002); *Lopez v. Wilson*, 426 F.3d 339, 358 (6th Cir. 2005). If the Supreme Court has not addressed the petitioner's specific claims, a reviewing district court cannot find that a state court acted contrary to, or unreasonably applied, Supreme Court precedent or clearly established federal law. *Carey v. Musladin*, 549 U.S. 70, 77 (2006); *see White v. Woodall*, 572 U.S. 415, 426 (2014) ("Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.").

In determining whether the state court's decision involved an unreasonable application of law, the Court uses an objective standard. *Williams*, 529 U.S. at 409. "A state court's determination that a claim lacks merit precludes federal habeas review so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Bray v. Andrews*, 640 F.3d 731, 738 (6th Cir. 2011). "A state

prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

## Discussion

### 1. *Grounds one and two are not cognizable*

In his first ground for relief, Scullin raises a Fourth Amendment challenge to the search of his vehicle. *See* Doc. 1-2, at 3-6. In his second ground for relief, Scullin raises a Fourth Amendment challenge to the search of his cell phone. *See id*. at 6–8. The problem with both of these grounds is that if a state has made "available [an] avenue for [a habeas petitioner] to present his claim to the state courts," the Supreme Court's decision in *Stone v. Powell*, 428 U.S. 465 (1976), "prohibits federal habeas corpus review of [the petitioner's] Fourth Amendment claim." *Good v. Berghuis*, 729 F.3d 636, 637, 639 (6th Cir. 2013).

Here, Scullin not only had an opportunity to "present his suppression motion to the state trial court," *id*. at 640, he took advantage of the opportunity. In August 2018, Scullin's trial counsel filed a motion to suppress as to both searches. Doc. 6-1, at 29–53. Counsel also filed a supplemental motion, together with supporting exhibits. *Id*. at 56–86. And the trial court held a lengthy, three-day suppression hearing. Doc. 6-2, at 26–170, 172–220; Doc. 6-3, at 5–112. At the end of the hearing, the trial court denied Scullin's motion

and provided a lengthy discussion explaining the basis for the court's decision. *Id*. at 101–12.

On appeal, Scullin challenged the trial court's denial of his motion. *See* Doc. 6-1, at 166–97. The Ohio court of appeals considered and rejected Scullin's arguments. *Scullin*, 2019 WL 3764587, at *3–17. And Scullin also raised these issues in an en banc application before the court of appeals and in his appeal to the Ohio Supreme Court. *See* Doc. 6-1, at 307–14, 335–46. Given the above circumstances, where Scullin "had 'the opportunity for full and fair consideration of [his exclusionary rule] claim[ ] in state court,'" this Court's review of his "'Fourth Amendment claim' is barred." *Hoffman v. Hooks*, No. 3:15-cv-1200, 2016 WL 4086788, at *2 (N.D. Ohio Aug. 2, 2016) (quoting *Good*, 729 F.3d at 637–38).

Scullin, however, argues that "habeas relief may still be available where an individual has been deprived of the opportunity to be fully and fairly heard." Doc. 9, at 8. Based on this premise, he asserts that he "was deprived of a fair opportunity to have meaningful state court consideration of his challenges." *Id*. Scullin then launches into an extended discussion of the merits of his Fourth Amendment argument. *See id*. at 8–28.

But Scullin ignores *Good*, which makes "clear that the *Powell* 'opportunity for full and fair consideration' means an available avenue for the prisoner to present his claim to the state courts, *not an inquiry into the adequacy of the procedure actually used* to resolve that particular claim." *Good*,

16

729 F.3d at 639 (emphasis added). A state's courts need only "'take cognizance of the constitutional claim and render a decision in light thereof.'" *Id*. at 638 (quoting *Moore v. Cowan*, 560 F.2d 1298, 1302 (6th Cir. 1977)). And this Court's role is to "ask[]: 'Did the state courts permit the defendant to raise the claim or not?'" *Hoffman*, 2016 WL 4086788, at *2 (quoting *Good*, 729 F.3d at 640). Because the record makes plain that Ohio's courts "permit[ted] [Scullin] to raise [his] claim[s]," review of those claims in this Court is barred.

Scullin, however, points to *Riley v. Gray*, 674 F.2d 522 (6th Cir. 1982), and says that it requires the Court to engage in a two-step inquiry. Doc. 9, at 7–8. By Scullin's lights, a court must first "'determine whether the state procedural mechanism, in the abstract, presents the opportunity to raise a fourth amendment claims.'" *Id*. at 7 (quoting *Riley*, 674 F.2d at 526). And then "'the court must determine whether presentation of the claim was in fact frustrated because of a failure of that mechanism.'" *Id*. at 7–8 (quoting *Riley*, 674 F.2d at 526). But *Good* rejected this reasoning and, "[c]onsistent with" the Sixth Circuit's earlier decision in *Moore v. Cowan*, 560 F.2d 1298, 1302 (6th Cir. 1977), and two concurrences in *Bradley v. Cowan*, 561 F.2d 1213 (6th Cir. 1977), made "clear" that a habeas court faced with a Fourth Amendment claim cannot "inquir[e] into the adequacy of the procedure actually used to resolve

that particular claim."[3] 729 F.3d at 639. Instead, the question is whether the state's "courts permit[ted] the defendant to raise the claim or not." *Id*. at 640.

Here, Ohio's courts more than permitted Scullin to raise his Fourth Amendment challenges. So his current grounds based on those issues are not cognizable. *Good*, 729 F.3d at 638–40.

### 2.  Ground three is procedurally defaulted

The basis for Scullin's third ground is somewhat unclear. In his petition, he says the issue is "Due process deprivation resulted from the government's refusal to produce material evidence related to an unrecorded, coercive interrogation." Doc. 1, at 9. In an attached, supporting document, he asserts that he "was denied due process of law and a fair trial as a result of the State's use of coercive interrogation techniques during a polygraph examination, exacerbated by the fact that the State refused to produce evidence related thereto." Doc. 1-2, at 9. Scullin asserts that he was "subjected to a polygraph examination," which resulted in the generation of "documents including some chart or graph." *Id*. According to Scullin, he was later questioned by FBI Special Agent Fragomeli, who purportedly possessed these documents. *Id*. And although Scullin requested these documents, the government refused his request. *Id*.

---

[3]     To be fair, Respondent also ignores *Good* and asserts that the Court should engage in the inquiry for which Scullin advocates. Doc. 6, at 19–22.

Following this factual premise, Scullin notes that under *Brady v. Maryland*, 373 U.S. 83 (1963), the State violates an accused's due process rights if it withholds evidence that is material to guilt or punishment. Doc. 1-2, at 9. He follows this with three assertions:

> (1) the State subjected Mr. Scullin to an unduly coercive, unrecorded polygraph interrogation and then withheld evidence related thereto, despite claiming that it demonstrated Mr. Scullin's guilt;

> (2) The trial court denied Mr. Scullin's request to suppress his statements made as a result of the coercive polygraph interrogation. The trial court also denied Mr. Scullin's motion seeking to compel the evidence generated during and as a result of the polygraph interrogation; and

> (3) Mr. Scullin was subjected to a coercive, unrecorded polygraph interrogation and then denied access to material evidence derived therefrom in violation of his rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution as well as firmly established United States Supreme Court precedent and, as such, he is entitled to habeas relief.

*Id*. at 10.

Although one might conclude that Scullin's third ground raises a challenge to his interrogation, Scullin makes clear in his traverse that his third ground is based on the argument that the government violated his due process rights by withholding exculpatory materials.[4] *See* Doc. 9, at 19, 20. So ground

---

[4]     Given the lack of clarity in Scullin's petition, it is perhaps not surprising that Respondent construed Scullin's petition as raising a challenge to his interrogation. *See* Doc. 6, at 25–26.

three raises a *Brady* claim. *See id.* at 21 (citing *Brady*), 22–23 ("The government … intentionally withheld favorable, material evidence which would have supported Mr. Scullin's constitutional claims."). There are several problems with Scullin's third ground, however.

For starters, Scullin did not fairly present his *Brady* claim to the Ohio Supreme Court. In this regard, a habeas petitioner with federal constitutional claims must "fairly presen[t]" those claims to the state courts, including the state's highest court, before raising them in a federal habeas corpus action. *See Robinson*, 950 F.3d at 343 (citation omitted). To meet this requirement, the "petitioner must present his claim to the state courts as a federal constitutional issue—not merely as an issue arising under state law." *Koontz*, 731 F.2d at 368. And "'general allegations of the denial of rights to a "fair trial" and "due process" do not "fairly present claims" that specific constitutional rights were violated.'" *Hand*, 871 F.3d at 418 (citation omitted).

In his appeal to the Ohio Supreme Court, Scullin did not mention *Brady* or any specific constitutional provision in relation to his current third ground for relief.[5] Instead, he relied on bald, unadorned generalities. He asserted that the evidence was material to his defense, but didn't explain how. Doc. 6-1, at 345. He asserted—without explanation—that "[t]he United States Constitution, Ohio Constitution, and Ohio Rules of Criminal Procedure make

---

[5]    Scullin presented his third habeas ground as his fourth proposition of law in his memorandum in support of jurisdiction filed with the Ohio Supreme Court. *See* Doc. 6-1, at 343–46.

clear that Appellant was entitled to this evidence as it involves statements made by Appellant, and results of testing performed on Appellant."[6] *Id*. But other than asserting it, Scullin didn't explain why these sources made it "clear that [he] was entitled to this evidence." He also asserted that the "[f]ailure to produce such evidence violated [his] constitutional rights and impeded his constitutional right to a defense." *Id*. at 346. Again, however, he didn't explain how or why these assertions were so.

Because Scullin's vague generalities about violations of unspecified constitutional provisions were not enough to fairly present his claims to the Ohio Supreme Court, and because it is now too late for him to do so, *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006), his *Brady* claim is procedurally defaulted, *see Solether v. Williams*, 527 F. App'x 476, 486 (6th Cir. 2013) (holding that because "Solether never argued in Ohio court that (and failed to develop a record establishing how) the disclosure of the polygraph results would have led to additional evidence or otherwise impacted defense strategy in a manner that would have materially affected the trial's outcome," the court could not review his "unexhausted and procedurally defaulted" claim); *see also Hand*, 871 F.3d at 418–19 (holding that Hand's failure to "connect the trial court's alleged [errors] to rights secured to him by the United States Constitution," meant that he had "not fairly present[ed] his … claims to the

---

[6]     Scullin specifically referred to Ohio Criminal Rule 16 as a source requiring disclosure. Doc. 6-1, at 344. But this reference to a state rule is insufficient to preserve a federal constitutional question.

state court on direct appeal, and those claims are therefore procedurally defaulted").

Scullin could avoid this default by showing cause for the default and establishing that actual prejudice resulted from the alleged violation of federal law. *Coleman*, 501 U.S. at 750. Or he could show that a fundamental miscarriage of justice will result if his claims are not considered. *Id*. Oddly enough, however, even though Respondent asserted that Scullin defaulted his third ground, Doc. 6, at 22–31, Scullin ignores the issue; he does not challenge in his traverse Respondent's assertion of procedural default and does not argue that he could show cause and prejudice. He also doesn't attempt show that a fundamental miscarriage of justice will result if his claims are not considered. So there is no need to consider these issues. *See Hand*, 871 F.3d at 419.

But even ignoring the above and considering the merits of Scullin's argument, he cannot prevail. A successful Brady has three elements: (1) evidence that is "favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) suppression of the evidence by the State; and (3) prejudice. *Strickler v. Greene*, 527 U.S. 263, 282–83 (1999). "The third component is sometimes referred to as the 'materiality' requirement." *Bies v. Sheldon*, 775 F.3d 386, 397 (6th Cir. 2014).

As to the first and third elements, Scullin says:

> *The evidence in the instant case was obtained from directly from Mr. Scullin and was material to the preparation of the defense. It included statements made by Mr. Scullin which were used against him in*

22

> *subsequent interviews and ultimately used to compel
> the purported confession. The evidence was created
> as a result of a scientific test performed on Mr.
> Scullin by a federal agent.* The evidence is clearly
> subject to disclosure pursuant to Ohio's discovery
> rules.
>
> Beyond the fact that the evidence was discoverable,
> it was material to guilt and would have impacted the
> outcome. Mr. Scullin zealously challenged the
> conduct of law enforcement in this case. In response,
> the prosecution not only intentionally withheld
> material evidence, it aggressively argued against
> the disclosure thereof.
>
> ….
>
> The government intentionally obfuscated the
> proceedings and were successful in hindering
> legitimate constitutional challenges to their
> questionable tactics. It intentionally withheld
> favorable, material evidence which would have
> supported Mr. Scullin's constitutional claims. The
> ends should not justify the means, but that is how
> the government in his case proceeded resulting in
> the deprivation of Mr. Scullin's constitutionally
> guaranteed right to due process granted by the
> Fourteenth Amendment to the United States
> Constitution.

Doc. 9, at 21–23 (emphasis added).

These assertions are not enough. First, notwithstanding the emphasized
language, the evidence at issue was not "obtained from directly from Mr.
Scullin" and it does not "include[] statements made by Mr. Scullin." Doc. 9, at
21. Instead, the evidence at issue consists of "charts and/or graphs from the
polygraph examination that" were generated during a polygraph and which an

FBI agent "used during the post-polygraph interview." *Scullin*, 2019 WL 3764587, at *18 n.4.

Second, other than saying it, Scullin offers no basis to the conclude that the charts and graphs were favorable or material. And Scullin—who is represented by counsel—says nothing about prejudice. *See* Doc. 9, at 20–23. Instead, he leaves the analysis of these issues to the Court's imagination. Not only is it not up to the Court to construct arguments for a represented party, but even if it were, it is a mystery how the charts and graphs could have been favorable or material.

Third, because "the result[] of a polygraph examination … is not 'evidence' at all" the result's "[d]isclosure … could have had no direct effect on the outcome of trial, because [Scullin] could have made no mention of [the results] either during argument or while questioning witnesses." *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995); *see State v. Davis*, 581 N.E.2d 1362, 1376 (1991) ("this court has never held that a defendant is entitled to the results of polygraph examinations, nor has this court held that polygraph examinations are scientific tests which are discoverable pursuant to Crim.R. 16").

And this matters because unless "withheld information … would have been admissible at trial or would have led directly to admissible evidence"[7]— which Scullin doesn't claim—the withheld information is not *Brady* material.

---

[7]    "[I]nadmissible material might … be considered material under *Brady* if it would 'lead directly' to admissible evidence.'" *Hughbanks v. Hudson*, 2 F.4th 527, 540 (6th Cir. 2021) (citations omitted).

*Gumm v. Mitchell*, 775 F.3d 345, 363 (6th Cir. 2014). So Scullin's *Brady* claim fails on the merits.

### 3. *Ground four fails on the merits*

In his fourth ground, Scullin says that he was subjected to "unduly coercive interrogation techniques [which] resulted in a violation of" his Fifth and Fourteenth Amendment rights. Doc. 1, at 11. The Ohio court of appeals dealt at length with Scullin's argument about his interrogation:

> {¶26} In his first assignment of error, appellant argues that the trial court erred in denying his motion to suppress with respect to the statements he made to the police. Specifically, appellant argues that the trial court erred in finding that (1) Detective Stolz's initial interrogation on October 31 was noncustodial in nature, and thus, *Miranda* warnings were not required, and (2) appellant's statements were not coerced and voluntarily made.

> a. Detective Stolz's Initial Interview

> {¶27} First, appellant challenges the trial court's finding that Detective Stolz's initial interrogation on October 31 was noncustodial in nature and thus *Miranda* warnings were not required.

>> Prior to a custodial interrogation, the accused must be apprised of his or her right against self-incrimination and right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Miranda* defines "custodial interrogation" as any "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444, 86 S.Ct. 1602.

> *Cleveland v. Oles*, 2016-Ohio-23, 45 N.E.3d 1061, ¶ 13 (8th Dist.).

25

{¶28} During the suppression hearing, Detective Stolz testified that on the morning of October 31, 2017, he received the results of the DNA testing from Dr. Butt. The results indicated that the victim's DNA was present on the blade and the handle of the knife that was found in appellant's pickup truck, and appellant's DNA was present on the knife's handle. After receiving the testing results, police obtained an arrest warrant for appellant.

{¶29} After obtaining a warrant for appellant's arrest, Detective Stolz contacted appellant around 10:30 a.m. and asked him to come to the police station. Appellant arrived at the police station around noon, and Detective Stolz brought him into the interview room in the police station's detective bureau.

{¶30} Detective Stolz explained that appellant had previously came into the police station, on his own free will, earlier that week on October 24 and 26, 2017. When appellant came into the station on the 24th and the 26th, he was not under arrest or detained in any way, and he was free to leave at any time. Detective Stolz interviewed appellant on the 24th and 26th in the same interview room in the detective bureau.

{¶31} During the interview on October 31, Detective Stolz testified that when appellant was initially brought inside the interview room, he was not placed under arrest or handcuffed. However, he explained that unlike the previous interviews on October 24 and 26, if appellant attempted to terminate the interview and leave the police station during the October 31 interview, he would have been placed under arrest.

{¶32} During the October 31 interview, before appellant was advised of his *Miranda* rights, Detective Stolz began going over appellant's previous statements about his whereabouts on the day of the murder. The officers were asking appellant the same questions they had previously

26

asked him: "[s]imple, open-ended questions; who, what, where, why. We went over ascertaining change [in appellant's responses]." (Tr. 245.) Detective Stolz asserted that he was asking appellant "to corroborate where he was [on October 23, 2017], not specific questions about the murder itself." (Tr. 246.) He confirmed that during this initial interview, he was not asking appellant whether he murdered the victim or the location of any weapons that had been used.

{¶33} Approximately 20 minutes into the interview, Detective Stolz began confronting appellant with information and evidence that contradicted appellant's statements. After he confronted appellant with the evidence that he received from Dr. Butt, Detective Stolz placed appellant under arrest and advised appellant of his *Miranda* rights.

{¶34} After reviewing the record, we find no merit to appellant's argument regarding Detective Stolz's initial interview. Appellant did not confess during Detective Stolz's initial interview, nor during the post-arrest phase of Detective Stolz's interview. Appellant denied any wrongdoing during Detective Stolz's interview, and did not confess to stabbing and shooting the victim until much later in the day during Special Agent Fragomeli's post-polygraph interview.

{¶35} Assuming, arguendo, that the trial court erred in finding that Detective Stolz's initial interview was noncustodial in nature, any error in this regard would be harmless. See *State v. Nelson*, 2017-Ohio-5568, 93 N.E.3d 472, ¶ 72 (8th Dist.). "Harmless error is an error that does 'not affect substantial rights.' Crim.R. 52(A). The harmless error standard asks whether the rights affected are substantial and, if so, whether a defendant has suffered any prejudice as a result. *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 36." *State v. Lindsey*, 8th Dist. Cuyahoga No. 106111, 2019-Ohio-782, ¶ 88; *see also State v. Durham*, 2016-Ohio-691, 60 N.E.3d 552, ¶ 172 (8th Dist.), citing *State v. Lytle*, 48

27

Ohio St.2d 391, 358 N.E.2d 623 (1976) (applying harmless error doctrine to a purported Miranda violation).

{¶36} In this case, appellant did not make any incriminating statements during the initial interview with Detective Stolz, nor did he confess to having any involvement in the murder. Even after Detective Stolz arrested appellant and advised appellant of his *Miranda* rights, appellant repeatedly insisted that he did not do anything wrong, that the victim took him in and was like a mother to him, and that he would not hurt anyone.

{¶37} For all of these reasons, we find no merit to appellant's argument that the trial court erred in concluding that the initial interview conducted by Detective Stolz was not a "custodial interrogation" implicating *Miranda*. Appellant's first assignment of error is overruled in this respect.

### b. Police Misconduct

{¶38} Second, appellant argues that he did not voluntarily waive his *Miranda* rights and that his confession was coerced. In support of this argument, appellant asserts that (1) Detective Stolz manipulated him using his infant daughter; (2) Special Agent Fragomeli psychologically coerced him using his infant daughter, and manipulated appellant into compiling an apology letter addressed to his daughter; and (3) Detective Stolz repeatedly threatened him with the death penalty and threatened to charge him with a crime that does not exist in the state of Ohio.

{¶39} In denying appellant's motion to suppress, the trial court concluded that (1) appellant knowingly, intelligently, and voluntarily waived his *Miranda* rights and spoke to the police, and (2) appellant's statements were voluntarily made and not the result of coercion or police misconduct. The trial court emphasized that officers read appellant his Miranda rights multiple times, including when he was in

28

custody, and each time, appellant voluntarily spoke with the officers and never indicated he did not understand the *Miranda* rights. The trial court also emphasized that appellant did not attempt to invoke his *Miranda* rights or his right to counsel at any time, nor did he attempt to stop the interviews in any way.

{¶40} In support of these findings, the trial court explained that (1) throughout the process of interrogating appellant on October 31, 2017, officers provided food and water to appellant; (2) when appellant complained of a headache, the officers provided aspirin to him; (3) the officers took several breaks and gave appellant "more time" when he asked for it (rather than continuously interrogating him); and (4) officers made sure appellant was comfortable, and they accommodated appellant when he said his handcuffs were too tight. Regarding Detective Stolz's reference to the death penalty, the trial court concluded that it was not an "illusory promise" and that the death penalty was a possibility at the time.

### i. Apology Letter

{¶41} Regarding Special Agent Fragomeli's suggestion that appellant write an apology letter to his daughter, Special Agent Fragomeli testified during the suppression hearing that he — not appellant — started writing the apology letter during the pre-polygraph interview. Special Agent Fragomeli explained the purpose for his suggestion that appellant write the letter:

> During our conversation I asked [appellant], I said, Hey, look. I'd like you to consider doing an apology letter to your daughter. And the reason is you can let her know the entire truth [about the October 23, 2017 incident]. If it is not a premeditated murder, if it is something else you're embarrassed or afraid about, you can let her know right now. And then years down the road when she can read and write, and she's in

school, people on the Internet will not use this situation to bully her, to traumatize her. And that's why I asked him to write that apology letter.

(Tr. 214-215.)

{¶42} In support of his argument that Special Agent Fragomeli improperly suggested that appellant write an apology letter to his daughter, appellant directs this court to *State v. Bohanon*, 8th Dist. Cuyahoga No. 89443, 2008-Ohio-1087. In *Bohanon*, the defendant-appellee filed a motion to suppress oral and written statements she had made to police. During one interview, a detective suggested that the defendant write an apology letter to her aunt. Following the detective's suggestion, the defendant wrote an apology letter to her aunt in which she confessed to the theft offense with which she was charged. The state introduced a copy of the defendant's apology letter into evidence. The trial court granted the defendant's motion to suppress the statements she made to police, concluding that the defendant's admission to the theft offense and written apology were not voluntarily made.

{¶43} On appeal, this court affirmed the trial court's judgment suppressing the defendant's statements. Initially, this court noted that in 1988, the First District found that it was "suspect" to ask the subject of an interrogation to draft an apology letter. *Id.* at ¶ 12, citing *State v. MacDonald*, 1st Dist. Hamilton No. C-860833, 1988 WL 3169, 3, 1988 Ohio App. LEXIS 229, 6-7 (Jan. 13, 1988). This court found "subtle inducement" in the detective's suggestion that the defendant write an apology letter to her aunt. *Id.* at ¶ 11. The court went on to conclude, "the inducement inherent in the officer's suggestion that [the defendant] write her aunt a letter of apology, combined with [the defendant's] limited intelligence and psychological conditions, rendered her confession in this case involuntary." (Emphasis added.) *Id.* at ¶ 12.

30

{¶44} After reviewing the record, we find this case to be distinguishable from *Bohanon*. First, in *Bohanon*, the defendant was initially found to be incompetent to stand trial.2 *Id.* at ¶ 2.

> [The defendant] was found to be mildly mentally retarded, with a documented IQ testing of 66. She also suffered from a psychotic disorder and was taking two anti-psychotic drugs. She was unable to understand the nature and objective of the legal proceedings and to assist her attorney at that time. The report establishing her restoration to competency diagnosed [the defendant] as suffering from bipolar disorder and borderline intellectual functioning.

*7 *Id.* at H 7.

{¶45} In this case, unlike *Bohanon*, appellant's competency was not called into question, nor was appellant found to be incompetent at any point. *See MacDonald*, 1988 WL 3169, at *3, 1988 Ohio App. LEXIS 229 at 6 (although questions existed regarding the literacy of the defendant, "there was no allegation that his mentality was subnormal."). Furthermore, there is no evidence in the record that appellant has limited intelligence, any mental diseases or defects, or that he was under the influence of alcohol, drugs, or medications at the time of Special Agent Fragomeli's interview.

{¶46} Second, unlike *Bohanon*, appellant did not draft, sign, or assent to the apology letter. Special Agent Fragomeli testified that the letter contained his words, not appellant's words, and he compiled the letter using a "reflective listening" technique. (Tr. 215.) Special Agent Fragomeli drafted the letter based on his understanding of what appellant communicated to him during the interview. Finally, Special Agent Fragomeli confirmed that the document he compiled during the interview was not, in fact, a letter because "it was never fulfilled. It was

never verified. It was never signed [by appellant]. * * * It is just notes." (Tr. 216.)

{¶47} Third, unlike *Bohanon*, in which the defendant confessed to the theft offense with which she was charged in the apology letter, appellant did not confess to the murder during the pre-polygraph interview during which Special Agent Fragomeli suggested that he write the letter. Appellant also denied any wrongdoing during the polygraph examination and during the early stages of the post-polygraph interview.

{¶48} Based on the foregoing analysis, we are unable to find that any inducement inherent in Special Agent Fragomeli's suggestion that appellant write an apology letter to his daughter rendered appellant's subsequent confession involuntary. Accordingly, appellant's first assignment of error is overruled in this respect.

### ii. Death Penalty

{¶49} Appellant further argues that his confession was coerced because the police repeatedly threatened him with the death penalty.

{¶50} During the suppression hearing, Detective Stolz acknowledged that during the October 31, 2017 interview, he asked appellant whether he wanted to see his daughter again, and he told appellant that he would not get any "breaks" at the sentencing hearing. (Tr. 248.) Detective Stolz asserted that he asked appellant if he knew the difference between premeditated murder and aggravated murder. (Tr. 249.) Furthermore, Detective Stolz advised appellant that the police would pursue the charge of premeditated murder. (Tr. 250.)

{¶51} Detective Stolz acknowledged during the suppression hearing, however, that (1) premeditated murder and aggravated murder are "the same thing," (2) the crime of premeditated murder does

not exist, and (3) he mistakenly referenced the crime of premeditated murder and/or suggested that there was a difference between premeditated murder and aggravated murder during the interview.

{¶52} Defense counsel asked Detective Stolz on cross-examination if he threatened appellant with the death penalty or told appellant that he was "not going to be around very long" during the October 31, 2017 interview. (Tr. 251-252.) Detective Stolz testified that he "asked [appellant] if he knew what could happen [regarding sentencing]." (Tr. 252.) Detective Stolz confirmed, "I didn't threaten [the death penalty]. I asked [appellant] simply did he know that [the death penalty] was definitely a possibility." (Tr. 252.)

{¶53} The trial court rejected the defense's theory that appellant's confession was coerced by the references to the death penalty during the October 31, 2017 interrogation. The trial court explained that it "was not an illusory promise when Detective Stolz told [appellant] that he faced the possibility of the death penalty, and there was nothing improper or coercive about that." (Tr. 278.)

{¶54} In support of his argument that his confession was coerced by Detective Stolz's threats regarding the death penalty, appellant directs this court to *State v. Kerby*, 2d Dist. Clark No. 03-CA-55, 2007-Ohio-187. In *Kerby*, the defendant confessed to his involvement in a murder and attempted robbery. The defendant filed a motion to suppress his confession, which the trial court denied.

{¶55} On appeal, the defendant argued, in relevant part, that "his confession was involuntary because it was obtained through the use of coercion and deception, along with tactics inducing fright and despair." *Id*. at ¶ 19. The Second District concluded that the trial court erred in denying the motion to suppress because "the evidence fails to demonstrate that [the defendant's] confession was voluntary." *Id*. at ¶ 21. In support of its holding, the court explained

33

that the officers' suggestion that the defendant could face the death penalty was "deceptively misleading and a misstatement of the law" which undermined the defendant's ability to voluntarily waive his Fifth Amendment privilege against self-incrimination. *Id.* at ¶ 84 -86. The Second District emphasized that at the time of the interview, the interrogating officers were aware of the defendant's age, 17 years old, which eliminated the possibility of the death penalty. Nevertheless, the officers "attempted to create the impression that [the defendant] could be facing a death sentence unless he cooperated with them and confessed." *Id.* at ¶ 87. For all of these reasons, the court concluded that the misstatement about the death penalty

> deprived [the defendant] of his capacity to intelligently and voluntarily waive his Fifth Amendment rights. When considering the totality of the surrounding circumstances, these factors outweigh the influence of [the defendant's] maturity and the overall short duration of the interrogation. Thus, we find that the trial court erred in determining that [the defendant's] confession to the police was voluntary.

*Id.* at ¶ 87.

{¶56} After reviewing the record, we find this case to be distinguishable from *Kerby*. First, unlike *Kerby*, the death penalty was not statutorily precluded based on appellant's age. Second, unlike *Kerby*, Detective Stolz did not deliberately mislead appellant or misstate the law regarding the possible penalties appellant could face. Pursuant to R.C. 2929.03(D)(1), the death penalty is a possible sentence for the offense of aggravated murder. Although Detective Stolz acknowledged that he made a misstatement of the law during the interview, the misstatement pertained to his reference of premeditated murder and to the extent that he implied that there was a difference between premeditated and aggravated murder. Detective

34

Stolz's misstatement of law did not pertain to the possible penalties that appellant could face.

{¶57} Third, unlike *Kerby*, Detective Stolz did not definitively know whether appellant would be charged with any death penalty specifications. At the time of the October 31, 2017 interview, the case had not been presented to the grand jury. As such, Detective Stolz had no way of knowing whether the state would pursue and whether the grand jury would charge appellant with any death penalty specifications pursuant to R.C. 2929.04(A)(1)-(10).

{¶58} "An interrogator may inform the suspect of the penalties for the offense of which he is suspected." *State v. Bays*, 87 Ohio St.3d 15, 23, 716 N.E.2d 1126 (1999), citing *State v. Arrington*, 14 Ohio App.3d 111, 115, 470 N.E.2d 211 (6th Dist.1984), *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir.1978), and *United States v. Vera*, 701 F.2d 1349, 1364 (11th Cir.1983). In *State v. Western*, 2015-Ohio-627, 29 N.E.3d 245 (2d Dist.), the Second District held that the interrogating detectives' repeated references to the death penalty were not improper because, based on the facts of the case, the detectives reasonably suspected that the defendant committed the offense of aggravated murder with prior calculation and design. *Id*. at ¶ 44. Accordingly, the court held that the detectives "did not overstate the potential charges against [the defendant], and they did not misstate the law in telling [the defendant] that he faced a possible death sentence if he were charged with premeditated murder." *Id*.

{¶59} Similarly, in the instant matter, Detective Stolz was permitted to inform appellant about the penalties for the offenses he was suspected of committing. The investigators reasonably suspected that appellant committed the crime of aggravated murder with prior calculation and design, for which one possible sentence is the death penalty. Furthermore, appellant did not confess to the murder during the interview with Detective Stolz. As noted above, appellant continued to deny any

wrongdoing during the interview with Detective Stolz, the pre-polygraph interview, polygraph examination, and the initial stages of the post-polygraph interview with Special Agent Fragomeli.

{¶60} Finally, the record reflects that appellant raised the issue of death penalty prior to the October 31, 2017 interrogations. During the suppression hearing, Detective Stolz testified, "prior to [the October 31 interview] in a different interview I asked [appellant] what should happen to the person that is responsible for this crime, and *he had offered the death penalty*." (Emphasis added.) (Tr. 253.) Accordingly, before Detective Stolz referenced the death penalty on October 31, 2017, appellant had an independent and subjective belief that the perpetrator could be sentenced to death.

{¶61} Based on the foregoing analysis, we are unable to conclude that Detective Stolz improperly referenced the death penalty during the October 31, 2017 interview, or that these references rendered appellant's subsequent confession involuntary. Accordingly, appellant's first assignment of error is overruled in this respect.

### iii. Burden

{¶62} Finally, appellant argues that the trial court "engaged in unconstitutional burden shifting" and "erred in improperly shifting the burden from the state to the defense in ruling that the defense did not prove [police] misconduct." Appellant's brief at 4.

{¶63} Typically, if a defendant "challenges a confession as involuntary, the state must prove a knowing, intelligent, and voluntary waiver by a preponderance of the evidence." *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, If 34. Appellant appears to argue that the trial court improperly shifted the burden from the state (to prove that the confession was voluntary and that appellant knowingly, intelligently, and voluntarily waived his *Miranda* rights) to the defense to

establish the existence of police misconduct or coercion.

{¶64} The state directs this court to R.C. 2933.81(B), which became effective in July 2010. In *State v. Jallah*, 8th Dist. Cuyahoga No. 101773, 2015-Ohio-1950, this court recognized that pursuant to R.C. 2933.81(B), when an interrogation is recorded electronically, as was the case here, a defendant's statements during the recorded interrogation are presumed to be voluntary. *Id.* at ¶ 80. Furthermore, this court explained that the statute places the burden on appellant to demonstrate that the recorded statement or confession was involuntary. *Id.*

{¶65} In the instant matter, we initially note that it is undisputed that there was a period of time, approximately two to three hours, during which the camera was turned off during the interviews on October 31, 2017. Appellant relies on this two-to-three-hour gap in the video recording in support of his argument that his confession was coerced. See appellant's brief at 9 ("[Special] Agent Fragomeli began interrogating [a]ppellant only after the cameras were turned off.").

{¶66} Special Agent Fragomeli testified during the suppression hearing that after executing consent and waiver forms regarding the polygraph examination, he conducted a pre-polygraph interview with appellant. The pre-polygraph interview was not recorded. (Tr. 191.) Special Agent Fragomeli explained what he discussed with appellant during the pre-polygraph interview: "I asked him to tell me basically why he's here, and just to make sure we're on the same page. Then I asked him to go through his day on October 23rd to the best of his recollection." (Tr. 191.) Special Agent Fragomeli testified that appellant denied any wrongdoing or involvement in the murder during the pre-polygraph interview: "[appellant] told me that he did not have any involvement with the injuries to [the victim] in any matter. That was it." (Tr. 195.)

37

{¶67} The post-polygraph interview, during which appellant confessed, was electronically recorded. Furthermore, the entire interview conducted by Detective Stolz was electronically recorded. As appellant acknowledges, "[t]he trial court had the opportunity to review each of the recorded interviews, and relied upon them heavily in reaching its decision." Appellant's brief at 9.

{¶68} Because appellant's statements and confession were recorded electronically, the trial court did not err in shifting the burden from the state to the defense to prove coercion. Furthermore, after reviewing the record, and based on the totality of the circumstances in this case, we find that the evidence supports the trial court's findings that (1) appellant knowingly, intelligently, and voluntarily waived his *Miranda* rights, and (2) appellant failed to meet his burden of establishing police misconduct or coercion. Accordingly, appellant's first assignment of error is overruled in this respect.

{¶69} For all of the foregoing reasons, we overrule appellant's first assignment of error. After reviewing the record, and based upon the totality of the circumstances, we are unable to conclude that appellant's statements were made involuntarily or that his will was overborne.

> For purposes of evaluating the voluntariness of a confession, the "totality of the circumstances" includes: "'the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.'" *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 54, quoting *State v. Mason*, 82 Ohio St.3d 144, 154, 694 N.E.2d 932 (1998).

*State v. Martinez*, 8th Dist. Cuyahoga Nos. 103572 and 103573, 2016-Ohio-5515, ¶ 33.

{¶70} This court will not conclude that appellant's *Miranda* waiver was involuntary "unless there is evidence of police coercion, such as physical abuse, threats, or deprivation of food, medical treatment, or sleep." *Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, at ¶ 35; *see also State v. Treesh*, 90 Ohio St.3d 460, 472, 739 N.E.2d 749 (2001) (finding that a reviewing court need not assess the totality of the circumstances unless the court finds that the tactics used by the detectives were coercive).

{¶71} Appellant was 21 years old when he was interviewed on October 31, 2017. Although appellant did not obtain his high school diploma, he obtained an HVAC certificate and was employed. During the change-of-plea hearing, appellant confirmed that he is able to read and write. (Tr. 332.)

{¶72} Although appellant asserts that he "suffer[s] from educational deficiencies," there is no evidence in the record indicating that he has mental or intellectual deficiencies or defects. Appellant's brief at 14. There is no indication that appellant was under the influence of drugs or alcohol during the October 31, 2017 interviews.

{¶73} The October 31 interrogations were not appellant's first interaction with the police in this case. Detective Stolz explained that appellant voluntarily came into the police station and spoke with him on two occasions earlier in the week. The October 31 interviews were conducted in the same location, the interview room in the detective's bureau, as the prior interviews. As such, appellant was familiar with the location.

{¶74} Throughout the course of the interviews, appellant was fed. Also, on several occasions, appellant was offered water and asked if he needed anything else. Appellant asserted that he had a headache, and he was provided aspirin.

{¶75} Detective Stolz testified that appellant arrived at the police station on October 31, 2017, around noon. Thereafter, Detective Stolz interviewed appellant. During this interview, Detective Stolz placed appellant under arrest. After Detective Stolz's interview, Special Agent Fragomeli conducted a pre-polygraph interview, a polygraph examination, and a post-polygraph interview. Appellant confessed to stabbing and shooting the victim during the post-polygraph interview. Detective Stolz testified that after Special Agent Fragomeli's interviews, appellant was returned to his cell at approximately 9:30 p.m.

{¶76} Special Agent Fragomeli did not continuously interrogate appellant without taking a break. Several breaks were taken over the course of the day. When appellant requested a break and asserted that he needed more time, the interrogation was suspended.

{¶77} Detective Stolz and Special Agent Fragomeli were accommodating to appellant and ensured that he was comfortable during the interrogations. Appellant was not handcuffed during the initial interview with Detective Stolz. At one point, after appellant had been placed under arrest and handcuffed, appellant asserted that the handcuffs were too tight. Officers adjusted the handcuffs and confirmed that appellant was comfortable. Appellant was not handcuffed when he confessed to the murder during Special Agent Fragomeli's post-polygraph interview. Special Agent Fragomeli testified that he never saw appellant in handcuffs.

{¶78} At all times during the interrogation, the officers were calm and respectful towards appellant. Appellant was not verbally abused, and the officers did not yell or scream at him. There is no evidence that appellant was physically abused or threatened. Finally, there is no evidence that appellant was subjected to any physical deprivation or mistreatment at any time during the interrogations.

{¶79} Finally, a review of the video recordings of the October 31 interviews supports the trial court's findings with respect to the voluntary nature of appellant's *Miranda* waiver and confession. For all of the foregoing reasons, we find that the trial court did not err in concluding that appellant's statements were voluntarily made and not the result of coercion or police misconduct.

{¶80} Appellant's first assignment of error is overruled.

*Scullin*, 2019 WL 3764587, at *4–10

Recall that the Ohio court of appeals' factual "determination … shall be presumed … correct." 28 U.S.C. § 2254(e)(1). To overcome this presumption, Scullin must rely on "clear and convincing evidence." *Id*. And to obtain relief under 28 U.S.C. § 2254, Scullin must show either that the court of appeals' decision on this issue (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the" United States Supreme Court; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Bergman v. Howard*, 54 F.4th 950, 956–57 (6th Cir. 2022) (explaining that the petitioner "must" meet the requirements of section 2254(d)), *cert. denied*, 143 S. Ct. 2445 (2023). The test established by section 2254(d) is "'difficult to meet.'" *Fields v. Jordan*, - - F.4th - -, 2023 WL 7266841, at *5 (6th Cir. Nov. 3, 2023) (en banc) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014)). Despite his burden and the court of appeals' lengthy discussion, however, Scullin says nothing about the standards in section 2254(d) and

ignores the fact that under section 2254(e)(1), the Ohio court of appeals' factual determinations are presumed correct.

Indeed, except at a high level of generality, Scullin barely mentions any United States Supreme Court cases that might even arguably form a basis to conclude that the Ohio court of appeals' decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the" United States Supreme Court. *See* Doc. 1–2, at 10–12 (citing general principles from *Miranda v. Arizona*, 384 U.S. 436 (1966), *Berkemer v. McCarty*, 468 U.S. 420 (1984), *California v. Beheler*, 463 U.S. (1983), and *Dickerson v. United States*, 530 U.S. 428 (2000)); Doc. 9, at 26 (citing *Dickerson*), 27 (citing *Miranda*), (citing *Arizona v. Fulminante*, 499 U.S. 279 (1990)); *see also* 28 U.S.C. § 2254(d)(1). But he does not so much as claim—as he must—that these cases present a materially indistinguishable set of facts in comparison to his case and that the state court's conclusion was the opposite of what the United States Supreme Court reached in the cases he cites.[8] *See William*s, 529 U.S. at 412–13 (explaining the operation of the *contrary to* clause). Indeed, he doesn't claim that the Supreme Court has addressed his specific claim. And without a basis to conclude that the Supreme Court has done so, a reviewing district court cannot find that a state court acted contrary to, or unreasonably applied,

---

[8]    Scullin cites Sixth and Tenth Circuit decisions, Doc. 9, at 26, 28, but those decisions do not constitute "clearly established Federal law, as determined by the Supreme Court" and "cannot form the basis for habeas relief." *Parker v. Matthews*, 567 U.S. 37, 48–49 (2012) (citation omitted).

Supreme Court precedent or clearly established federal law.[9] *Carey*, 549 U.S. at 77. So Scullin has forfeited any claim that the Ohio court of appeals' decision was contrary to, or involved an unreasonable application of, clearly establish Federal law.

Nor does Scullin grapple with the alternative requirement that he show that the Ohio court of appeals "decision … was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2). Instead, he simply offers his version of the facts without explaining how they differ from those found by the court of appeals or why that court's findings should be rejected. Implicitly, he expects the Court to connect the dots for him. But it is not the Court's role to do that, especially for a represented party. *See Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("it is not the obligation of [a] court to research and construct legal arguments open to parties, especially when they are represented by counsel"); *cf. Magnum Towing & Recovery v. City of Toledo*, 287 F. App'x 442, 449 (6th Cir. 2008) ("It is not the district court's … duty to search through the record to develop a party's claims"). So Scullin has also forfeited any claim that the court of appeals'

---

[9]     The fact that Scullin cites a number of Ohio cases leaves the impression that he isn't aware of the requirements of 28 U.S.C. § 2254, and that he has largely taken his argument from a filing he submitted before an Ohio court. *See* Doc. 1-2, at 12; Doc. 9, at 25–27. Indeed, as noted above, he ignored the need to show cause and prejudice as to ground three despite the fact that Respondent raised the issue.

"decision … was based on an unreasonable determination of the facts in light of the evidence presented."

Scullin has "ignore[d]" "his burdens under 28 U.S.C. 2254(d) and (e)(1)" and thus necessarily failed to carry them. *McLean v. McKee*, No. 1:12-cv-1401, 2017 WL 4324789, at *7 (W.D. Mich. Sept. 29, 2017). The Court should reject Scullin's fourth ground.

## Conclusion

For the reasons set forth above, I recommend that Scullin's petition be dismissed.


Dated: November 13, 2023

/s/ *James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge




## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019)